## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **WADE ROBINSON,** | |
| **Plaintiff,** | |
| **v.** | **Case No.  16-2138-DDC-GLR** |
| **WICHITA STATE UNIVERSITY, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

This matter comes before the court on defendants John Bardo and Wichita State University's Motion for Judgment on the Pleadings (Doc. 55).  Defendants filed this Motion on May 15, 2017.  The parties have filed responses and replies.  For the reasons explained below, the court grants defendants' motion in part and denies it in part.  After identifying the governing facts, this order explains the reasons for this holding.

I.      **Facts**

The following facts come from plaintiff's First Amended Complaint (Doc. 48).  Because the current dismissal motion relies on Federal Rule of Civil Procedure 12(c), the court must accept the pleaded facts as true and view them in the light most favorable to plaintiff.  *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000).  The court emphasizes that this standard controls the facts assumed at this stage of the case.  In short, the court expresses no opinion whether they represent the facts that, ultimately, the factfinder would believe.

Dr. Wade Robinson, plaintiff, brings this suit in response to the decision by defendant Wichita State University ("WSU") to terminate his employment.  Plaintiff began working at

WSU in July 2009.  He was WSU's Vice President for Campus Life & University Relations.  As Vice President for Campus Life & University Relations, plaintiff provided the oversight function for Title IX compliance, student conduct, housing enrollment, and other related activities.  On April 25, 2013, plaintiff learned that a member of WSU's basketball team allegedly had committed a rape.  Two days later, plaintiff told defendant John Bardo, the University President, that WSU needed to investigate the incident to comply with WSU's Title IX obligations.  On April 29, plaintiff took the lead on the Title IX investigation into the alleged rape.  After conducting an initial investigation, plaintiff filed a formal Title IX complaint by submitting an incident report to WSU.  Mr. Bardo later threatened plaintiff's employment status.

About a year later, in January 2014, plaintiff learned of another alleged rape at WSU. Plaintiff again led the Title IX investigation and encouraged the putative victim to provide a formal statement.  The victim declined.  Plaintiff also met with the alleged perpetrator twice.  On July 10, 2014, Mr. Bardo demoted plaintiff to Vice President of Student Engagement.  Also, in August 2014, Mr. Bardo moved plaintiff into a small office space.[1]

On January 12, 2015, plaintiff informed Mr. Bardo that the putative victim of the January 2014 rape would provide a formal statement.  Because the victim was making a formal statement, plaintiff proceeded with a formal investigation, as required by Title IX.  On January 15, 2015, plaintiff was verbally informed that WSU would terminate his employment effective June 30, 2015.[2]

Over the next few months, plaintiff heard many things about his termination.  Plaintiff met with a human resources employee who informed plaintiff that WSU had decided to terminate his employment because he "did not fit" and the administration was trying to find a

---

[1]     The Complaint does not specify the reason Mr. Bardo gave plaintiff for the demotion.

[2]     The Complaint does not specify who informed plaintiff of this decision.

reason for immediate termination.  Also, plaintiff received two anonymous notes reporting that employees in the President's office secretly were telling others that WSU had decided to terminate plaintiff's employment.  When plaintiff met with Mr. Bardo about his termination, Mr. Bardo explained that WSU had decided to terminate plaintiff's employment because he was too loyal to his staff, he was a big man with a loud voice, others perceived him as a bully, and he had allowed the costs for Shocker Hall[3] to balloon.  On June 1, 2015, plaintiff learned that Mr. Bardo had told people[4] at WSU that plaintiff did not have the credentials for his job.

On March 2, 2015, the Registry for College and University Presidents ("Registry") published a job announcement for plaintiff's job.  The announcement reported, "The incumbent is aware he is leaving at the end of the academic year or sooner; the incumbent does not fit with the culture of the executive leadership team" and "the current operation is too hierarchical and punishment-centered."  Doc. 48 ¶ 38.  The Registry sent this announcement to their members, who are retired student affairs professionals available to fill university and college positions on an interim basis.  Mr. Bardo provided this information to the Registry.

Mr. Bardo also explained to WSU Student Body President Matt Conklin why he had terminated plaintiff.  Mr. Bardo stated that:  "[T]he conduct process overseen by [plaintiff] was too punitive in nature rather than educational as it should be;" "the Student Affairs Division improperly allocated finances in supporting the institution's goals;" and "the Student Affairs Division is too bureaucratic in nature."  Doc. 48 ¶ 40.[5]  On May 9, 2015, *The Wichita Eagle*

---

[3]     Shocker Hall is student dormitory on WSU's campus.

[4]     The Complaint does not provide the names of the people who had heard this statement.

[5]     In his response to the motion, plaintiff submitted an affidavit from Mr. Conklin, asserting that Mr. Bardo made these statements.  Doc. 58-1.  The court does not rely on this affidavit in considering this motion; instead, it simply relies on the allegations in the Complaint.  *See In re Sprint Corp. Securities Litig.*, 232 F. Supp. 2d 1193, 1212 (D. Kan. 2002) (refusing to consider an affidavit that plaintiff submitted in response to a motion to dismiss).

published an article where it asked Mr. Conklin why WSU fired plaintiff.  Mr. Conklin answered by repeating the statements that Mr. Bardo made to him.[6]  *The Wichita Eagle* also quoted the Registry's announcement about the position.

WSU terminated plaintiff's employment on June 30, 2015.  On July 10, 2015, plaintiff requested records from WSU under the Kansas Open Records Act ("KORA").  He requested documents referencing plaintiff's termination and WSU's attempt to use the Registry to find plaintiff's replacement.  WSU eventually complied with plaintiff's KORA request 17 weeks later.

## II.     Claims

Plaintiff asserts five claims against defendants.  First, plaintiff asserts a claim against WSU under Title IX for Retaliation (Count I).  Next, plaintiff asserts a claim under 42 U.S.C. § 1983 against Mr. Bardo for depriving plaintiff of a liberty interest without due process (Count II).  Third and fourth, plaintiff asserts a defamation claim (Count III) and an invasion of privacy claim against Mr. Bardo (Count IV).  And last, plaintiff asserts a claim under KORA against WSU (Count VII).

## III.    Legal Standard

Defendants seek judgment on the pleadings under Fed. R. Civ. P. 12(c).  Courts evaluate a Rule 12(c) motion using the same standard used to evaluate a motion to dismiss under Rule 12(b)(6).  *See Turner v. City of Tulsa*, 525 F. App'x 771, 772 (10th Cir. 2013).

The court will grant a motion for judgment on the pleadings only when the factual allegations in the complaint fail to "state a claim for relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law decides the case,

---

[6]     In his response, plaintiff submitted the article from *The Wichita Eagle* that printed Mr. Bardo's statements to Mr. Conklin.  The court does not consider this evidence when deciding the Motion for Judgment on the Pleadings and simply relies on the allegations in the Complaint.  *See In re Sprint*, 232 F. Supp. 2d at 1212.

*Neitzke v. Williams*, 490 U.S. 319, 326 (1989).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'"  *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

## IV.    Analysis

### A.    Title IX Retaliation Claim (Count I)

Title IX prohibits educational institutions who receive federal financial assistance from discriminating against any individual based on sex.  20 U.S.C. § 1681.  "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  Educational institutions thus can incur liability under Title IX if they retaliate against a person who has complained about discrimination aimed at the complainant.  *Id.* at 179.  In addition, and distinct from that kind of liability, educational institutions can incur liability if they retaliate against a person who has complained about allegedly discriminatory treatment directed at another.  *Id.* at 179 (holding that a Complaint sufficiently alleged a Title IX violation when it alleged that a school fired a women's basketball coach who had complained that the women's team received less funding, equipment, and facility time than the men's team).

In Title IX retaliation actions, the court applies the same standards as those applied to Title VII retaliation cases.  *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 (10th Cir.

2017) (applying the same test to resolve a Title VII and Title IX claim). To succeed on a Title IX retaliation claim, then, the plaintiff must establish that: (1) the employer took an adverse employment action against the plaintiff; (2) plaintiff engaged in protected activity; and (3) the employer adversely affected plaintiff's employment because of plaintiff's protected activity. *Id.* WSU argues that the court should enter judgment against plaintiff's Title IX claim because plaintiff never engaged in protected activity. Specifically, WSU argues that plaintiff could not have engaged in protected activity when all of his involvement with the alleged activity Title IX protects was part of his job duties.

The theoretical premise of WSU's argument is correct. An employee cannot engage in protected activity while performing his job duties. *Weeks v. Kansas*, 503 F. App'x 640, 642 (10th Cir. 2012) (citing *McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996). This rule is known as the "manager rule." *Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1230, 1248 (D. Kan. 2016) (discussing *McKenzie*, 94 F.3d at 1486–87).

But if the plaintiff/employee steps outside the scope of his job duties and "file[s] (or threaten[s] to file) an action adverse to the employer, actively assist[s] other[s] in asserting [Title IX] rights, or otherwise engage[s] in activities that reasonably could be perceived as directed towards the assertion of rights protected by [Title IX]," then the employee engages in protected activity. *McKenzie*, 94 F.3d at 1486–87. This protection reaches conduct as informal as filing a complaint with the employer. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding Title VII prohibits "employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997))).[7]

---

[7]     As additional support for his position, plaintiff cites a "Dear Colleague" letter from the Department of Education Office for Civil Rights. WSU argues that the court need not defer to this letter under administrative law

6

Here, plaintiff has alleged both that he actively assisted others in asserting Title IX rights and that he personally filed adverse actions against WSU. The Complaint alleges that plaintiff "took the lead on the investigation into the alleged rape incident" in April 2013. Doc. 48 ¶ 18. In addition, the Complaint alleges that plaintiff "filed a formal Title IX complaint into the alleged rape incident" shortly thereafter. *Id.* ¶ 19. Plaintiff also alleges he took the lead on a rape investigation in February 2014. *Id.* ¶ 23. The Complaint does not allege that plaintiff merely advised WSU of the best course of action or that WSU could face a Title IX claim if it did nothing. Instead, the Complaint alleges that plaintiff helped others assert rights under Title IX. Because the Complaint alleges plaintiff helped others assert rights under Title IX, the Complaint sufficiently alleges that plaintiff was engaged in protected activity.

To support its argument that plaintiff cannot engage in protected activity when plaintiff's job duties included Title IX compliance, WSU analogizes this case to *McKenzie*, *Weeks*, and *Atkinson v. Lafayette College*, 653 F. Supp. 2d 581 (E.D. Pa. 2009). WSU contends that all three of those cases involved employees whose job responsibilities included compliance with similar federal laws—just like plaintiff here—and so, the court should enter judgment against the Title IX claims. Those cases, however, differ from this one and those differences matter.

In *McKenzie*, the employing company had terminated the plaintiff's employment in her role as the company's personnel director. *McKenzie*, 94 F.3d at 1481. Before plaintiff's termination, she had discussed possible FLSA violations with the company's president and its corporate attorney after she reviewed handouts from a seminar about wage and hour laws attended by a co-worker. *Id.* When the company fired plaintiff, she sued, asserting a FLSA retaliation claim. *Id.* The jury found for plaintiff but the district court granted the company's

---

principles, particularly *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The court does not decide what weight, if any, the letter deserves because the law on the question is clear. At most, the letter applies the rule described in *McKenzie* to Title IX coordinators, which WSU appears to acknowledge.

motion for judgment as a matter of law under Fed. R. Civ. P. 50. *Id.* at 1483. The district court concluded that plaintiff had failed to adduce evidence at trial negating the company's legitimate reasons for firing her. *Id.*

The Tenth Circuit rejected the district court's rationale for granting the Rule 50 motion, but it nonetheless affirmed the district court's decision to enter judgment for the employer under Rule 50. *Id.* It reasoned that the evidence at trial could not support a finding that plaintiff "crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint . . . and *asserting* a right adverse to the company." *Id.* at 1486. Instead, she merely "informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations." *Id.* So, the Circuit reasoned, the manager rule legally precluded a verdict for plaintiff. *Id.*

Had the Complaint in this case merely alleged that plaintiff warned WSU that it could face liability for failing to investigate alleged sexual assaults, the court might enter judgment against plaintiff on Count I. Such conduct would resemble the conduct of the *McKenzie* plaintiff. But here, the Complaint alleges substantially more than that. It alleges that plaintiff started two investigations and filed a complaint. The Complaint thus sufficiently alleges that plaintiff "crossed the line from being an employee merely performing [his] job as [Title IX compliance overseer]" and "actively assisted other[s] . . . in asserting [Title IX] rights . . . ." *Id.* at 1486. These allegations preclude the court from applying the manager rule to plaintiff's claim and thus preclude judgment on the pleadings.

*Weeks* also presents materially different facts. There, the district court granted summary judgment against a Title VII retaliation claim and the Tenth Circuit affirmed. The Circuit held that no genuine dispute existed whether plaintiff had engaged in protected activity because, as

she conceded, she merely had performed her job duties.  *Weeks*, 503 F. App'x at 642.  Here, the Complaint has made no such concession.

Last, WSU relies on *Atkinson*.  In that case, the district court granted summary judgment to the employer on a Title IX retaliation claim because, in part, plaintiff could come forward with no evidence permitting a jury to find that she had engaged in protected activity.  *Id.* at 602.  The summary judgment facts established that plaintiff had done nothing more than advocate Title IX compliance.  *Id.* at 599.  The record showed that plaintiff and her employer quarreled only about the source of funding used to implement changes plaintiff deemed necessary to comply with Title IX and whether the employer should become a Division I or III school.  *Id.* at 602.  Because these disputes "only tangentially involved Title IX," plaintiff had failed to demonstrate a genuine dispute whether she had engaged in protected activity.  *Id.*  Here, the Complaint is quite different.  It alleges that plaintiff and WSU disagreed about plaintiff's handling of Title IX investigations into alleged sexual assaults—a central component of Title IX compliance.  *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (holding that schools cannot be deliberately indifferent to known acts of sexual harassment that interfere with a victim's ability to receive an education and comply with Title IX's mandate).  This Complaint, unlike the summary judgment record in *Atkinson*, sufficiently alleges that plaintiff engaged in protected activity to prevent the court from entering judgment as a matter of law.

WSU warns that allowing claims such as plaintiff's to go forward would allow any management, human resource, or legal employee to sue when fired.  This fear is not well founded.  If the Complaint simply had alleged that WSU fired plaintiff because of advice he had given the university about how best to comply with Title IX, plaintiff would have no retaliation claim.  But the Complaint's allegations present much more than that.  They allege that plaintiff

took steps that made him adverse to WSU because he investigated alleged sexual assaults and made a related filing of a Title IX complaint against WSU.  Not every terminated management, human resource, or legal employee can allege he took these steps before the employer fired him.

WSU also worries that claims such as plaintiff's—if allowed to proceed—will allow courts to second-guess every decision made by a governmental employer.  This hyperbole is not persuasive.  Certainly, the court's reasoning will permit an employee who properly alleges facts capable of supporting a finding that the employee has engaged in protected activity to proceed to discovery.  But that is precisely what Congress chose to protect.  *See Jackson*, 544 U.S. at 180 ("Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also to provide individual citizens effective protection against those practices. . . . [T]his objective would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation.").  The court is not free to reweigh the benefits and detriments of these policy decisions.  In addition, Title IX does not apply just to governmental employers.  Title IX applies to "*any* education program or activity receiving Federal financial assistance," including private educational institutions.  20 U.S.C. §1681(a) (emphasis added).  The court thus denies WSU's Motion for Judgment on the Pleadings against plaintiff's Title IX claims.[8]

---

[8]     Plaintiff argues that *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 555 U.S. 271 (2009), limited the manager rule.  *Crawford* broadly defined when an employee opposes an employer's unlawful practice under Title VII.  *Id.* at 276 ("The term 'oppose,' being left undefined by [Title VII], carries its ordinary meaning. . . : 'to resist or antagonize; to contend against; to confront; resist; withstand . . . .'" (quoting Webster's New International Dictionary 1710 (2d ed. 1957)) (further citations omitted)).  The Tenth Circuit in *Weeks* declined to decide whether *Crawford* limited the manager rule.  503 F. App'x at 643.  Other circuits are divided on *Crawford*'s effect on the manager rule.  *See Loudon v. HealthSouth Corp.*, No. 16-2713-JAR-GEB, 2017 WL 2440276, at *3 (D. Kan. June 6, 2017) (discussing how different circuits have addressed *Crawford*'s effect on the manager rule).  Because the court finds that the Complaint sufficiently alleges that the manager rule does not apply here, the court declines to decide whether *Crawford* limited the manager rule in the fashion advocated by plaintiff.

### B.  Section 1983 Claims (Count II)

Count II alleges that Mr. Bardo violated plaintiff's civil rights under 42 U.S.C. § 1983. Doc. 48 ¶ 92.  A defendant is liable under § 1983 if, under color of state law, he deprives a person of a constitutional right.  42 U.S.C. § 1983.  Specifically, the Complaint alleges that Mr. Bardo violated plaintiff's right to procedural due process under the Fourteenth Amendment by disparaging plaintiff, ruining his reputation, and foreclosing similar work opportunities otherwise available to plaintiff by making defamatory statements without due process of law.  Doc. ¶¶ 82–92.  Plaintiff argues that four of Mr. Bardo's statements disparaged plaintiff and ruined plaintiff's reputation.  After outlining the standard governing this theory, the court applies the law to the four statements.

### 1.  Governing Law

A state official deprives a plaintiff of his liberty interest without due process of law when he makes a defamatory statement about plaintiff and that statement causes an alteration in plaintiff's legal status.  *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Paul v. Davis*, 424 U.S. 693 (1976)).  In *Brown*, the Tenth Circuit held that a Complaint sufficiently alleged that an officer deprived plaintiff of his liberty interest by alleging that the officer wrongly placed the plaintiff on the sex offender probation unit—which constituted defamation—and that his placement there required plaintiff to register as a sex offender and limited his travel, employment, and residency opportunities.  *Id.* at 1169.  This placement produced a change in the plaintiff's legal status.  *Id.*  In the context of public employment, the Tenth Circuit has held a governmental supervisor violates an employee's liberty interest when he defames the employee in the context of termination, foreclosing other employment opportunities for plaintiff. *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) (quoting *Workman v. Jordan*, 32 F.3d

475, 480 (10th Cir. 1994)).  To allege this claim sufficiently, plaintiff must allege facts to support

four elements.  *Id.*[9]

The first element requires the Complaint to allege that the governmental employer made

a repugnant statement about the plaintiff.  *See Monroe v. City of Lawrence, Kan.*, 124 F. Supp.

3d 1097, 1124–25 (D. Kan. 2015) (granting summary judgment on plaintiff's deprivation of

liberty claim because he produced no evidence that the allegedly defamatory statements

concerned him).

The second element requires the Complaint to allege that the statement was false.

*McDonald*, 769 F.3d at 1212.  Statements of opinion cannot be false and thus are not actionable

unless they imply unstated falsehoods.  *Michaels v. City of McPherson, Kan.*, 71 F. Supp. 3d

1257, 1260 (D. Kan. 2014).

The third element requires the Complaint to allege that defendant made the defamatory

statement "in the course of terminating the employee," and that the statement foreclosed other

employment opportunities for plaintiff.  *McDonald*, 769 F.3d at 1212.  This element does not

require that the defamatory statement occur strictly contemporaneously with the termination.

*Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000).  For example, in

*McDonald*, the Complaint alleged that defendant did not make the defamatory statement until

more than a month after defendant had fired plaintiff.  769 F.3d at 1209.  Despite this delay, the

Tenth Circuit held that the defendant made the remark in the course of termination and thus

sufficiently had alleged a liberty deprivation claim sufficient to survive a motion to dismiss

---

[9]       Mr. Bardo incorrectly asserts that there are three variations on this test, as articulated in *Workman*, *Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012), and *Martin Marietta Materials, Inc. v. Kansas Department of Transportation*, 810 F.3d 1161 (10th Cir. 2016).  Doc. 56 at 18.  The first two—*Workman* and *Guttman*—use precisely the same test.  *Compare Workman*, 32 F.3d at 480 *with Guttman*, 669 F.3d at 1125–26.  *Martin Marietta Materials* does not apply in this case because it involved an independent contractor, not an employee, who alleged a state actor had defamed him.  *Id.* at 1185.

under Rule 12(b)(6).  *Id.* at 1212.  In other cases, the Circuit has emphasized that a roughly

contemporaneous remark that concerns the "'manner or reasons for the employee's termination'

may qualify as one made 'in the course of termination of employment.'"  *Bjorklund v. Miller*,

467 F. App'x 758, 768 (10th Cir. 2012) (quoting *Renaud*, 203 F.3d at 727).

The third element also requires that defendant's statement forecloses other employment

opportunities for plaintiff.  *Renaud*, 203 F.3d at 728 n.1.  The Tenth Circuit has held that "[o]nly

where the stigmatization results in the inability to obtain other employment does [a government

employment defamation] claim rise to a constitutional level."  *Allen v. Denver Pub. Sch. Bd.*, 928

F.2d 978, 982 (10th Cir. 1991), *disapproved of on other grounds*, *Kendrick v. Penske Transp.*

*Servs., Inc.*, 220 F.3d 1220, 1228 (10th Cir. 2000).  The Circuit also explained:

> "To understand the tort you must go back to its origins in cases where public
> employees were fired for suspected Communist sympathies.  In the atmosphere of
> those times, employees fired on such grounds found it difficult to land equally
> responsible jobs, public or private.  The circumstances of discharge, at least if
> they were publicly stated, had the effect of blacklisting the employee from
> employment in comparable jobs.  If a state or the federal government formally
> banned a person *from a whole category of employment*, it would be infringing
> liberty of occupation—a component of the liberty that the due process clauses of
> the Fifth and Fourteenth Amendment protect, and recognized as such almost since
> the beginning of this nation."

*Id.* (emphasis added) (quoting *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)).

While *Allen* did not specify whether "foreclosing other employment" means an inability

to secure *any* job or simply an inability to secure a job in the plaintiff's chosen field, later Tenth

Circuit precedent appears to decide this question.  *See Watson v. Univ. of Utah Med. Ctr.*, 75

F.3d 569, 579–80 (10th Cir. 1996) (holding that summary judgment against a deprivation of

liberty claim was inappropriate in part because plaintiff presented evidence that she no longer

worked in her chosen field as a labor and delivery nurse even though plaintiff had been hired as a

nurse in a different field); *see also Salazar v. City of Albuquerque*, 776 F. Supp. 2d 1217, 1241

13

(D.N.M. 2011) (holding that a Complaint sufficiently pleaded a deprivation of liberty claim when it alleged that plaintiff had been hired as a garbage truck driver instead of as a bus driver, which was plaintiff's chosen field).  In short, that a plaintiff secured other employment does not bar his deprivation of liberty claim as a matter of law.  What will bar a deprivation of liberty claim is evidence that his job is substantially similar to his previous one.  *See Isler v. N.M. Activities Ass'n*, 893 F. Supp. 2d 1145, 1156–57 (D.N.M. 2012) (granting summary judgment against plaintiff's deprivation of liberty claim because plaintiff could not show defendant's statements foreclosed employment opportunities when the summary judgment facts showed plaintiff accepted a comparable job with better salary and benefits).

The fourth and final element requires the Complaint to allege that the defendant made the information public.  *Bell v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 343 F. Supp. 2d 1016, 1021 (D. Kan. 2004).

In the motion, Mr. Bardo asserts that the court should enter judgment against Count II because the Complaint fails to allege sufficiently a deprivation of a liberty interest.  He makes several arguments in support of this assertion.  Some of these arguments address issues that affect the four allegedly defamatory statements equally.  The other arguments address issues that affect just one or two of the statements.  To simplify this complexity, subdivision 2—called "Common Issues"—addresses the arguments that affect all four of the alleged statements.  Then, in subdivision 3, the court analyzes whether each of the statements deprived plaintiff of his liberty interest.  Last, the court turns to the qualified immunity issue.

### 2.      Common Issues

Mr. Bardo argues that Count II suffers from three flaws affecting each statement allegedly depriving plaintiff of his liberty interest.  First, Mr. Bardo argues that the Complaint

fails to allege that Mr. Bardo defamed plaintiff in the context of termination and thereby foreclosed other employment opportunities.  Part a of this section addresses this theory.  Next, Mr. Bardo argues that the Complaint fails to allege Mr. Bardo personally participated in the termination, freeing him from liability.  Part b analyzes this argument.  Last, Mr. Bardo argues that plaintiff never was deprived of due process.  Part c discusses this assertion.

### a.      Context of Termination and Foreclosure of Opportunities

A § 1983 claim of the kind asserted here requires that the Complaint allege defendant made defamatory statements "in the course of terminating the employee" and the statements foreclosed other employment opportunities for plaintiff.  *McDonald*, 769 F.3d at 1212.  This element does not require that the defamatory statements occur strictly contemporaneously with the termination.  *Renaud*, 203 F.3d at 727.  Instead, roughly contemporaneous remarks about the reasons for the termination are enough to prevail on this requirement.  *Id.*  Here, plaintiff alleges that Mr. Bardo made allegedly defamatory statements as news spread of plaintiff's termination. And all of the statements involve the reasons WSU decided to terminate plaintiff.  The Complaint thus alleges sufficiently that Mr. Bardo defamed plaintiff in the context of termination.  Mr. Bardo makes two arguments that these contentions cannot support a finding that he violated plaintiff's liberty interest.  Both miss the mark.

First, Mr. Bardo argues that plaintiff has not alleged a liberty interest because he had no legal entitlement to a renewed contract.  If plaintiff had just alleged that WSU did not renew his contract, Mr. Bardo's argument might prevail.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575 (1972) (holding an at-will employee did not have an entitlement to continued employment when the employer had not promised to renew the contract when it expired).  But when a Complaint alleges defendant defamed plaintiff in the course of terminating the

employment relationship, the rule is different.  *See McDonald*, 769 F.3d at 1210–1212 (holding an at-will employee had no property interest in his employment but holding he had "a liberty interest in his good name and reputation as they relate to his continued employment").  So, this argument will not support the result sought by defendants' motion.

Next, Mr. Bardo argues that plaintiff's procurement of another job means as a matter of law that no liberty deprivation occurred because defendant's statement did not foreclose other employment.  But, as discussed above, plaintiff's procurement of another job does not nullify his claim.  Instead, plaintiff's Complaint only needs to allege that he cannot find work in his chosen field.  *See Watson*, 75 F.3d at 579–80 (holding that summary judgment was inappropriate on a deprivation of liberty claim in part because the plaintiff presented evidence that she no longer worked in her chosen field).  Plaintiff's Complaint alleges that his new position is not comparable to his WSU position.  Doc. 48 ¶ 52.  Plaintiff's Complaint thus sufficiently pleads that Mr. Bardo defamed plaintiff in the context of termination, foreclosing other employment opportunities.  That enables this claim to survive judgment on the pleadings.

### b.    Personal Participation

Defendant Bardo's next argument contends that because he did not participate personally in the alleged conduct depriving plaintiff's rights, plaintiff cannot prevail against him on Count II.  He makes three subsidiary arguments to support this aspect of his motion.

First, Mr. Bardo argues that many of the statements identified in the Complaint are not attributable to Mr. Bardo.  Doc. 56 at 20.  Plaintiff's Opposition brief clarified his position on this issue, explaining that the only statements he claims as defamatory are ones that the Complaint alleges were made by Mr. Bardo.  Doc. 58 at 20.

Next, Mr. Bardo argues that the Complaint cannot state a claim against him because WSU employed plaintiff—not Mr. Bardo.  Doc. 56 at 19–20.  He analogizes this case to two cases.  But neither one applies here.  The first case is *Siegert v. Gilley*, 500 U.S. 226 (1991).  Mr. Bardo argues that *Siegert* stands for the proposition that a defamatory statement made by a former supervisor who was not the plaintiff's employer cannot support a claim for a deprivation of an employee's liberty interest.  This characterization of *Siegert* misapprehends its holding.

In *Siegert*, a psychologist resigned after his employer—a hospital run by the United States government—notified the psychologist that it was preparing to terminate his employment.  *Id.* at 228.  The hospital concluded that the psychologist was not dependable or reliable, did not comply with his supervisor's orders, and failed to appear for work without approval for the absence.  *Id.*  The psychologist resigned to avoid the embarrassment of the hospital terminating his employment and then found work at an Army hospital.  *Id.*  As a requirement to receive the necessary credentials to work for the Army hospital, the psychologist gave the Army permission to speak to his former employer—the federal hospital—about the psychologist's previous work history and his admitting privileges.  *Id.*  The psychologist's former supervisor at the federal hospital—the defendant in the case—responded to the Army's inquiry, saying that "he 'considered [the psychologist] to be both inept and unethical, perhaps the least trustworthy individual I have supervised in my thirteen years at [the federal hospital].'"  *Id.* (quoting the Complaint).  The Army declined to give the psychologist the credential he needed to perform his new job and the psychologist left the Army hospital.  *Id.*  When the psychologist discovered what his former supervisor—the defendant—had informed the Army, he sued, asserting a violation of his liberty interest.  *Id.* at 229.  The psychologist alleged that the former supervisor had deprived

him of his liberty interest by maliciously publishing a defamatory statement that caused the psychologist to lose his job at the Army hospital.  *Id.*

The former supervisor filed a motion to dismiss or, alternatively for summary judgment. It asserted a qualified immunity defense.  *Id.*  The district court denied the supervisor's motion to dismiss, arguing that the Complaint alleged enough facts to overcome qualified immunity.  *Id.* at 230.  He appealed that decision[10] and the D.C. Circuit reversed.  *Id.*  The Circuit assumed without deciding that maliciously publishing a defamatory letter had deprived the psychologist of his liberty interest.  *Id.*  But it held that the case should be dismissed because the Complaint failed to allege specific facts that would allow a factfinder to conclude that the supervisory made the statement maliciously.  *Id.* at 231.

The Supreme Court granted certiorari and agreed that the case should be dismissed.  *Id.* But the Court disapproved of the Circuit assuming that maliciously publishing a defamatory letter deprived the psychologist of his liberty interest.  *Id.* at 232.  The Supreme Court held that the psychologist could not state a claim for a violation of his liberty interest because the former supervisor did not make the allegedly defamatory statement "incident to the termination."  *Id.* at 234.  The Court held that the Complaint could not allege a defamatory statement incident to termination because the hospital and the former supervisor had not terminated the psychologist's employment—the psychologist resigned.  *Id.*  And the supervisor responded to the Army several weeks after the psychologist resigned.  *Id.*  The Court emphasized, "injury to reputation *by itself* was not a 'liberty' interest protected under the Fourteenth Amendment."  *Id.* at 233 (citing *Davis*, 424 U.S. at 708–09).

---

[10]     A governmental official has the right to file an interlocutory appeal when a district court denies him a qualified immunity defense on a motion to dismiss.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court recognized that a defamatory statement made outside the context of termination would be actionable under traditional tort law, but it did not give rise to a constitutional violation.  *Id.*  While the Federal Tort Claims Act imposes liability on the United States under most traditional tort principals, the psychologist did not pursue a traditional defamation claim against the United States because the Federal Tort Claims Act barred suits against the United States for defamation claim.  *Id.* at 234 (citing 28 U.S.C § 2680(h)).  That the plaintiff had sued his former supervisor—not the United States, his former employer—mattered only because the suit's target defined the nature of the claim he could bring.  *Id.* at 233–34.  If the plaintiff had sued his former employer, the United States, traditional tort law and the provisions of the Federal Tort Claims Act would apply.  *Id.* at 234.  A suit against his former supervisor required a tort rising to a constitutional level.  *See id.* at 233.

This holding does not decide the claim that the Complaint asserts here because plaintiff has alleged more than just damage to his reputation.  The Complaint alleges facts that, if proved true, could support a finding that Mr. Bardo defamed plaintiff in the course of termination, thereby foreclosing similar employment opportunities for plaintiff.  For example, the Complaint alleges that Mr. Bardo, when responding to Mr. Conklin's question asking why WSU had fired plaintiff, replied that "the Student Affairs Division improperly allocated finances in supporting the institution's goals . . . ."  Doc. 48 ¶ 40.  This statement was made two months after WSU informed plaintiff of its decision and concerns a reason why WSU fired plaintiff.  Plaintiff thus sufficiently alleges a constitutional tort and can sue his former supervisor Mr. Bardo.  *See McDonald*, 769 F.3d at 1212.

The second case Mr. Bardo cites is *Guttman*.  Doc. 56 at 20.  That case involved a doctor who sued two state medical board officials.  *Guttman*, 669 F.3d at 1107.  The doctor had a

history of depression and post-traumatic stress disorder but the New Mexico Board of Medical Examiners initially granted him a medical license. *Id.* at 1106. But later, after receiving numerous complaints about the doctor, the Board ordered him to meet with the Impaired Physician Committee. *Id.* This Committee recommended that the Board revoke the doctor's license and the Board agreed. *Id.* at 1107. The defendants—two Board officials—published information describing the results of the hearing to a National Practitioner Data Bank and the doctor alleged he could not find work as a result. *Id.* at 1125. The doctor sued, asserting that the two medical board officials violated his liberty interest when they defamed him in the published information. *Id.* He also asserted that he could not find work as a result of the published information. *Id.*

The medical board officials moved to dismiss the case, arguing that plaintiff failed to allege that the officials defamed him in the context of termination. *Id.* at 1126. The district court agreed. *Id.* On appeal, the Tenth Circuit concluded that the Complaint failed to allege that the two officials defamed the doctor in the fashion required to state a constitutional claim against the officials under § 1983. *Id.* It reasoned that the officials plaintiff had sued did not serve as his direct supervisor and did not even work for the same hospital that had employed plaintiff. *Id.* They thus could not defame the doctor in the employment context because they were not involved in the decision to terminate his employment. *Id.*; *cf. Bjorklund*, 467 F. App'x at 761, 763 (allowing a former employee to sue under § 1983 a Board of Trustees member—who voted to terminate the employee's employment—for defaming him in the context of a termination).

Here, Mr. Bardo and plaintiff worked for the same employer. The Complaint alleges that Mr. Bardo was plaintiff's supervisor and played a role in terminating plaintiff's employment.

Doc. 48 ¶¶ 29, 36.  This case is different than *Guttman* and it does not compel judgment against plaintiff's § 1983 claim against Mr. Bardo.

### c.      Deprivation of Process

Mr. Bardo's last argument contends that the Complaint fails to allege that he denied plaintiff any process.  Specifically, Mr. Bardo argues that:  (1) since Mr. Bardo was not plaintiff's employer, he could not give plaintiff a grievance hearing; and (2) the Complaint never alleges Mr. Bardo even knew plaintiff wanted a grievance hearing.  Neither argument is persuasive.

When an employer defames an employee in the course of termination, the employee has a right to a name-clearing hearing.  *McDonald*, 769 F.3d at 1213.  At this hearing, plaintiff must have the chance to "to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation."  *Id.* (internal quotations omitted) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004)).

The Tenth Circuit has ruled that a case should survive a motion to dismiss when the complaint alleges that a former supervisor defamed the employee and the supervisor did not provide the plaintiff a chance to clear his name.  *McDonald*, 769 F.3d at 1215.  Also, the Circuit differentiated between people who held the power to provide plaintiff a hearing and those who did not.  *Id.*  *McDonald* held that the mayor—who was plaintiff's supervisor—had the power to provide a hearing.  *Id.*  Here, the Complaint alleges that Mr. Bardo was plaintiff's supervisor and thus in a position to give him a name-clearing hearing.  Doc. 48 ¶ 29.

As for Mr. Bardo's other argument—that the Complaint never alleges that Mr. Bardo knew plaintiff wanted a grievance hearing—the Tenth Circuit has held that an employee need not request a name-clearing hearing to prevail on a deprivation of liberty claim.  *Bjorklund*, 467 F.

App'x at 767–68.  Plaintiff's Complaint thus sufficiently alleges that defendant deprived plaintiff process.

### 3.     Statements Alleged to Deprive Plaintiff's Liberty Interest

Plaintiff argues that Mr. Bardo made four statements that disparaged and ruined plaintiff's reputation.  They are:  (a) "[plaintiff] did not have the credentials to be the Vice President for Campus Life & University Relations when he interviewed and was hired in April and May of 2009" ("the credentials statement");  (b) "the Student Affairs Division improperly allocated finances in supporting the institution's goals" ("the finances statement"); (c) "the Student Affairs Division is too bureaucratic in nature" ("the bureaucratic statement"); and (d) "the conduct process overseen by [plaintiff] was too punitive in nature rather than educational as it should be" ("the punitive statement").  Doc. 58 at 20.  Mr. Bardo argues that none of these statements could deprive plaintiff of his liberty interest.  The court considers each statement, in subsections a through d below.

> ### a.     The Credentials Statement ("[Plaintiff] did not have the credentials to be the Vice President for Campus Life & University Relations when he interviewed and was hired in April and May of 2009.")

Mr. Bardo argues that there are two reasons why the credentials statement cannot support a deprivation of liberty claim.  First, the credentials statement reasonably could not affect plaintiff's reputation.  Second, it is an opinion and thus not actionable.

### i.     Reputation

Only statements that affect a plaintiff's reputation can impugn a liberty interest.  *Monroe*, 124 F. Supp. 3d at 1127.  "'[U]nfounded charges of dishonesty' are sufficient to impugn" a government employee's reputation.  *Id.*  Here, the court cannot conclude that no reasonable factfinder could find that the credentials statement, as alleged, implies that plaintiff dishonestly

secured his job at WSU.  The credentials statement thus alleges a statement sufficient to impugn plaintiff's reputation.

### ii.    Opinion

Statements of opinion cannot be false and are thus not actionable unless they imply unstated falsehoods.  *Michaels*, 71 F. Supp. 3d at 1260 (holding that a statement could disparage an employee by asserting that an employee engaged in "conduct unbecoming an officer" because it implied the employee was unfit to serve as an officer without factual support).  Here, the Complaint alleges that Mr. Bardo did not disclose the factual basis for his statement that plaintiff lacked the proper credentials when WSU hired him.  Much like the *Michaels* statement, this statement—as alleged in the Complaint—implies that plaintiff either fabricated his credentials or secured his job improperly.  And the Complaint also alleges that Mr. Bardo did not articulate the facts on which he based this statement.  On the current record, the court cannot say that the credentials statement is purely an opinion and incapable of disparaging plaintiff's reputation. The credentials statement thus sufficiently alleges that Mr. Bardo deprived plaintiff of his liberty interest.

### b.    The Finances Statement ("The Student Affairs Division improperly allocated finances in supporting the institution's goals.")

Mr. Bardo argues that the finances statement is incapable of supporting Count II.  First, Mr. Bardo argues that the finances statement is an opinion.  Then, Mr. Bardo argues that the Complaint fails to allege that the finances statement concerns plaintiff.

### i.    Opinion

As explained above, opinions that imply unstated falsehoods can disparage an employee's reputation.  *Id.*  The finances statement meets this criterion.  According to the Complaint, Mr. Bardo did not disclose the factual basis for his statement that the Student Affairs

Division improperly allocated its finances.  *See* Doc. 48 ¶ 40.  Much like the statement in

*Michaels*, this statement—as alleged—implies that the Student Affairs Division wasted its

money and suffered from financial incompetence while lead by plaintiff.  The finances statement

thus is legally sufficient to disparage plaintiff's reputation and is capable of being false.

### ii.    Concerning Plaintiff

To disparage plaintiff's reputation, defendant must make a statement about the plaintiff.

*See Monroe*, 124 F. Supp. 3d at 1124–25 (granting summary judgment on plaintiff's deprivation

of liberty claim because he produced no evidence that the allegedly defamatory statements

concerned him).  Mr. Bardo contends that he intended for the finances statement to communicate

information to WSU's Student Body President Matt Conklin about the state of the Student

Affairs Division.  Perhaps this is so, and perhaps a factfinder would find that the statement

merely referenced the work of the Student Affairs Division.  But at this stage, and in the context

of this motion, a reasonable factfinder could find that the statement referred to plaintiff.  After

all, the Complaint alleges that Mr. Bardo made this statement in response to Mr. Conklin's

question asking why WSU terminated plaintiff.  Because the finances statement is not an opinion

and the Complaint sufficiently alleges that it refers to plaintiff, it can support the claim asserted

in Count II.[11]

### c.    The Bureaucratic Statement ("The Student Affairs Division is too bureaucratic in nature.")

Mr. Bardo argues that the bureaucratic statement is incapable of supporting the claim

asserted in Count II.  First, Mr. Bardo argues that the Complaint never alleges that the

---

[11]    Mr. Bardo cites *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), to support his assertion that Count II fails because the statement fails to identify plaintiff specifically.  *Sullivan* held that there was insufficient evidence at trial to connect a statement to the plaintiff when statement merely mentioned plaintiff once and referred to general police conduct that the plaintiff oversaw.  *Id.* at 291–92.  Here, the Complaint's allegations are different.  Based on them, a reasonable factfinder could find that the circumstances surrounding Mr. Bardo's statements to Mr. Conklin about the Student Affairs Division connect Mr. Bardo's statement to plaintiff.

bureaucratic statement concerns plaintiff.  Then, Mr. Bardo argues that the bureaucratic statement is an opinion and thus incapable of supporting a damage to reputation claim.

### i.      Concerning Plaintiff

To disparage plaintiff's reputation, defendant must have made a statement about the plaintiff.  *See id.*  For the same reasons that the financing statement is sufficient to refer to plaintiff, the court finds that the bureaucratic statement sufficiently refers to plaintiff.  *See supra*, Part IV.B.3.b.ii.  While both statements asserted that the Student Affairs Division was too bureaucratic and had mismanaged its finances, Mr. Bardo made both statements in response to Mr. Conklin's question about WSU's reasons for terminating plaintiff's employment.

### ii.      Opinion

Statements that are pure opinion and do not imply falsehoods cannot support a deprivation of liberty claim.  *Flanagan v. Munger*, 890 F.2d 1557, 1572 (10th Cir. 1989) (affirming summary judgment against a deprivation of liberty claim because the statements "were not true facts [but] were merely opinion").  Loose, figurative, or hyperbolic language likewise cannot imply falsehoods.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990).  Here, the ordinary meaning of the words in the statement—that the operation was "too" bureaucratic—reports a subjective opinion that one cannot prove as factually true or untrue.  One cannot verify, factually, whether the WSU Student Affairs operation under plaintiff's leadership was "too bureaucratic" in the way one could verify whether a person had acted in a way unbecoming of an officer.  *Cf. Michaels*, 71 F. Supp. 3d at 1260.  Because the bureaucratic statement consists of opinion and hyperbole—and not fact—the court concludes that it cannot provide the predicate needed to support a deprivation of liberty claim.

>    **d.    The Punitive Statement** ("The conduct process overseen by [plaintiff] was too punitive in nature rather than educational as it should be.")

Mr. Bardo argues that the punitive statement is an opinion incapable of supporting the claim asserted by Count II.  This statement is similar to the "bureaucratic" statement.  It uses loose, figurative language that one cannot verify or disprove factually.  *Cf. id.*  The court concludes that this statement cannot support a deprivation of liberty claim for the same reasons applied to the bureaucratic statement.

>    **e.    Summary**

Plaintiff sufficiently has alleged a deprivation of his liberty interest without due process of law.  The Complaint alleges that Mr. Bardo made two false statements that impugned plaintiff's reputation and good name in the context of termination, which foreclosed other employment opportunities for plaintiff.  The actionable statements are:  (a) "[plaintiff] did not have the credentials to be the Vice President for Campus Life & University Relations when he interviewed and was hired in April and May of 2009;" and (b) "the Student Affairs Division improperly allocated finances in supporting the institution's goals."  Also, the Complaint sufficiently alleges that Mr. Bardo personally participated in the deprivation of liberty and that he denied plaintiff due process.  And last, the Complaint sufficiently alleges that Mr. Bardo made these statements in the context of termination, foreclosing other employment opportunities for plaintiff.  In contrast, the court concludes that the last two statements—the bureaucratic statement and the punitive statement—cannot support the claim asserted in Count II.  It thus grants Mr. Bardo's motion as it applies to those two statements.

This conclusion requires the court to consider whether qualified immunity protects Mr. Bardo from suit based on the first two statements.  Part 4, which follows, takes up that question.

### 4.   Qualified Immunity

Mr. Bardo argues that qualified immunity shields him from suit.  Qualified immunity protects government officials from suit when a governmental official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *see also District of Columbia v. Wesby*, No. 15-1485, 2018 WL 491521, at *10 (U.S. Jan. 22, 2018).  For a statutory or constitutional right to achieve "clearly established" status, existing precedent must place the right beyond debate in the mind of a reasonable governmental official.  *Id.*  Also, the court cannot look to decisions recognizing the right at a high level of generality; instead, the existing precedent must be "particularized to the facts of the case."  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))).

"This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).  So, the existing precedent either must involve materially similar facts or define when an official's conduct obviously will violate the law.  *White*, 137 S. Ct. at 552.  Qualifying precedent usually comes from cases decided by the Supreme Court or Tenth Circuit, but clearly established case law in other circuits also can supply the requisite precedent.  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003).  Existing precedent must have established the right at issue clearly by the time the official took the action challenged in the suit.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017).  In short, only "the plainly incompetent

or those who knowingly violate the law" do not qualify for qualified immunity.  *Id.* at 1867

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Plaintiff's Complaint alleges Mr. Bardo violated clearly established law when, in 2015,

he allegedly acted to deprive plaintiff's constitutional rights.  In 2015, plaintiff asserts a number

of Tenth Circuit decisions had recognized that an employer who defames an employee in the

course of a termination violates the employee's liberty interest.  *See, e.g.*, *McDonald*, 769 F.3d at

1215 (holding that existing precedent clearly established this right in 2012 when defendant

allegedly defamed plaintiff).  Mr. Bardo claims that existing precedent, by 2015, clearly had

established three rules germane to this suit and the Complaint fails to allege that Mr. Bardo

violated any of them.

First, he claims that a government employer could not incur liability under § 1983 if the

governmental employer merely defamed an at-will employee.  This much is correct.  *See Siegert*,

500 U.S. at 234.  But, as explained above, the Complaint here alleges more than simple

defamation.  The Complaint alleges that Mr. Bardo defamed plaintiff *and* that his defamation

tarnished plaintiff's good name and reputation and thus affected his employability.  Such

conduct, if proven true, violated clearly established law existing in 2015.  *See McDonald*, 769

F.3d at 1215.

Second, Mr. Bardo argues precedent existing in 2015 clearly established that a plaintiff,

to implicate due process rights, must allege that defendant deprived him of a protected liberty

interest.  Again, Mr. Bardo's premise is correct.  *See Roth*, 408 U.S. at 569–70 ("The

requirements of procedural due process apply only to the deprivation of interests encompassed

by the Fourteenth Amendment's protection of liberty and property.").  But as explained above,

the Complaint alleges that defendant violated a protected liberty interest—his interest in his good

name and reputation as they relate to his continued employment—when he defamed plaintiff in the context of terminating his employment.  *See supra*, Part IV.B.

The last 2015 rule Mr. Bardo recognizes is the one requiring the defendant to participate personally in the constitutional violation as a predicate to liability under § 1983.  Again, his legal premise is accurate.  *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  The problem for Mr. Bardo's argument, as explained above, is that the Complaint alleges that Mr. Bardo personally participated by making defamatory statements about plaintiff.  *See supra*, Part IV.B.2.c.  Therefore, the court concludes that the Complaint adequately alleges Mr. Bardo violated law that was clearly established in 2015 when he allegedly acted.  This means that qualified immunity does not protect him from suit on Count II.

### C.      State Law Claims

The Complaint alleges several state law claims.  Count III alleges that Mr. Bardo defamed him.  Count IV alleges that Mr. Bardo invaded plaintiff's privacy.  And Count VII alleges that WSU violated the Kansas Open Records Act.  Defendants have moved for judgment under Rule 12(c) in his favor on those claims.  This section addresses his attack on these three state law claims.  But before it turns to the substance of Mr. Bardo's arguments, the court must answer two questions:  Whether the court has jurisdiction to entertain the state law claims and, if so, which state's law to apply to them.

Starting with the jurisdictional issue, the court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  A related

provision, 28 U.S.C. § 1367, provides:  "[I]n any civil action of which the district courts have

original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims

that are so related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article III of the United States Constitution."  *See also*

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (holding that a district court has

"[p]endent jurisdiction" over state law claims in a case if subject matter jurisdiction exists over

the federal claim and the "state and federal claims . . . derive from a common nucleus of

operative fact").  Here, plaintiff's state law claims revolve around the same set of operative facts

as his § 1983 claim (Count II):  WSU's termination of plaintiff's employment and Mr. Bardo's

statements about WSU's decision.  This means the court has jurisdiction over plaintiff's Kansas

law claims under § 1367.

Turning to the choice of law issue, the parties never dispute that Kansas law governs

plaintiff's common law claims against the defendants.  Indeed, defendants, in their Motion for

Judgment on the Pleadings, and plaintiff, in his Opposition, cite Kansas law.  The choice of law

rules also dictate that the court apply Kansas law.

"In a diversity action, [courts] apply the choice of law rules of the forum state."  *Kipling*

*v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014).  "This rule also applies

when a federal court exercises supplemental jurisdiction over state law claims in a federal

question lawsuit"—as is the case here.  *BancOklahoma Mtg. Corp. v. Capital Title Co., Inc.*, 194

F.3d 1089, 1103 (10th Cir. 1999) (quoting *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132,

136 (6th Cir. 1996)).  Kansas is the forum state, and its law applies the "law of the 'place of the

wrong'" to tort claims.  *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1455 (D.

Kan. 1995) (citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985)).

The place of the wrong was Kansas.  Both plaintiff's defamation and invasion of privacy claims seek redress for harm allegedly inflicted on a person.  *See Gruschus v. Curtis Publ'g Co.*, 342 F.2d 775, 776 (10th Cir. 1965) (discussing the basis for defamation and invasion of privacy claims).  Plaintiff is a Kansas resident, so the place of the wrong was Kansas.  Kansas law thus governs plaintiff's state law claims.

### 1.    Defamation (Count III)

Count III alleges that Mr. Bardo defamed plaintiff.  To prove defamation, a plaintiff must show that (1) defendant made a false and defamatory statement, (2) defendant communicated the statement to a third person, and (3) plaintiff sustained harm to his reputation as a result.  *Hall v. Kan. Farm Bureau*, 50 P.3d 495, 504 (Kan. 2002).

Plaintiff alleges five separate statements defamed him:  (a) "[plaintiff] did not have the credentials to be Vice President for Campus Life & University Relations when he interviewed and was hired in April and May of 2009" ("the credentials statement"); (b) "the Student Affairs Division improperly allocated finances in supporting the institution's goals" ("the finances statement"); (c) "[t]he Student Affairs Division is too bureaucratic in nature" ("the bureaucratic statement"); (d) "the conduct process overseen by [plaintiff] was too punitive in nature rather than educational as it should be" ("the punitive statement"); and (e) the "current operation is too hierarchical and punishment-centered" ("the hierarchical statement").[12]   Plaintiff alleges that Mr. Bardo made the finances, bureaucratic, and punitive statements to Mr. Conklin, the "credentials statement" to unspecified people on WSU's campus, and the "hierarchical statement" to the Registry.  Mr. Bardo asserts that none of these statements—as alleged in the

---

[12]    The first four statements are the statements plaintiff's Complaint relies on for his claim that he was deprived of his liberty interest and thus provide the basis for his § 1983 claim.  *See supra*, Part IV.B.  The Complaint does not allege that statement (e) deprived plaintiff of his liberty interest.  *See* Doc. 58 at 20.

Complaint—defamed plaintiff.  The court addresses Mr. Bardo's arguments against each statement individually.

        **a.**        **The Credentials Statement** ("[Plaintiff] did not have the credentials to be the Vice President for Campus Life & University Relations when he interviewed and was hired in April and May of 2009.")

Mr. Bardo asserts the credentials statement cannot support Count III.  He argues there are three reasons why the credentials statement cannot support a defamation claim as alleged in the Complaint.  First, the credentials statement reasonably could not affect plaintiff's reputation.  Next, it is an opinion and thus not actionable.  And last, the Complaint fails to allege sufficiently that Mr. Bardo published the credentials statement.

### i. Reputation

Mr. Bardo argues that there was no harm to plaintiff's reputation in making statement (4).  "[D]amage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982).  "'Proof of [damage to one's reputation] typically entails showing that persons were deterred from associating with the plaintiff, that plaintiff's reputation has been lowered in the community, or that the plaintiff's profession suffered.'" *Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F. Supp. 2d 1263, 1280 (D. Kan. 2012) (quoting *Ali v. Douglas Cable Commc'ns*, 929 F. Supp. 1362, 1385 (D. Kan. 1996)).  The Complaint alleges that plaintiff experienced difficulty finding work after Mr. Bardo terminated him.  The court cannot conclude on a Rule 12(c) motion that no reasonable factfinder could infer that Mr. Bardo's statement caused plaintiff's difficulty finding work.  Admissible evidence might support a finding that the statement implied plaintiff improperly received his job at WSU and thus damaged plaintiff's reputation.

### ii.      Opinion

Statements of personal opinion or hyperbole cannot provide the predicate for a defamation action under Kansas law.  *See Byers v. Snyder*, 237 P.3d 1258, 1271 (Kan. Ct. App. 2010) (discussing *Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A.*, 26 P.3d 1284 (Kan. Ct. App. 2001)).  But an opinion based upon undisclosed facts can support a defamation claim. *Phillips v. Moore*, 164 F. Supp. 2d 1245, 1259 (D. Kan. 2001); *see also Michaels*, 71 F. Supp. 3d at 1260 (holding that a statement could disparage an employee falsely when it asserted an employee had engaged in "conduct unbecoming an officer" because it implied the employee was unfit to serve as an officer without factual support).  "Whether a given statement constitutes an assertion of fact or an opinion is a question of law to be determined by the court."  *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983).  When determining whether the statement asserts a fact or an opinion, the court must consider the context in which the defendant made the statement.  *Id.*

Here, as alleged in the Complaint, Mr. Bardo's credential statement disclosed no factual basis for this assertion.  Much like the *Michaels* statement, this statement implies that plaintiff either fabricated his credentials or somehow secured his job improperly.  On the current record, the court cannot say that the credentials statement is incapable of providing the requisite predicate for a defamation action.

### iii.      Publication

Mr. Bardo argues that plaintiff's failure to articulate to whom, when, and in what context Mr. Bardo made the allegedly defamatory statements is fatal to plaintiff's defamation claim based on the credentials statement.  To plead an actionable claim for defamation under Kansas law, a plaintiff must allege "the names of those persons to whom [the defamatory statements]

were . . . published and the time and place of their publication." *White v. Gen. Motors Corp., Inc.*, 908 F.2d 675, 681 (10th Cir. 1990) (internal quotation omitted) (imposing sanctions on plaintiff because plaintiff failed to investigate and allege to whom the defendant made the allegedly slanderous remarks); *but see Wenner v. Bank of Am., NA*, 637 F. Supp. 2d 944, 955 (D. Kan. 2009) (citing *Rinsley v. Frydman*, 559 P.2d 334, 338–40 (Kan. 1977)) (suggesting a court should not grant a Motion to Dismiss a defamation claim because the Complaint fails to allege who published the allegedly defamatory statement, what the allegedly defamatory statement was, and when the defendant made the allegedly defamatory statement). Plaintiff, however, need not state those requirements with specificity. *Wenner*, 637 F. Supp. 2d at 954 (citing Fed. R. Civ. P. 9(b)).

Here, plaintiff alleges that Mr. Bardo made the credential statement to "people on the WSU campus." Doc. 48 ¶ 45. The Complaint identifies the statement. The Complaint identifies who made the statement. But the Complaint does not allege when or to whom Mr. Bardo made the statement. The court concludes that while the current Complaint insufficiently alleges that the credentials statement can support a defamation claim, the court refuses to enter judgment against it at this time. Instead, the court grants plaintiff leave to amend his Complaint to plead when and to whom defendant made the credentials statement. If plaintiff fails to do this within 21 days of this order being entered, defendant may file a renewed motion for judgment on the pleadings on this issue.

        **b.**     **The Finances Statement** ("The Student Affairs Division improperly allocated finances in supporting the institution's goals.")

Mr. Bardo argues that the Complaint fails to allege the finances statement supports Count III. First, Mr. Bardo argues that the finances statement is an opinion. Then, he argues that the Complaint fails to allege that the statement concerns plaintiff.

### i.      Opinion

As already explained, opinions that imply unstated falsehoods can defame a plaintiff. *Phillips*, 164 F. Supp. 2d at 1259.  The finances statement meets this criterion.  As alleged, Mr. Bardo did not disclose a factual basis for his statement that the Student Affairs Division improperly allocated its finances.  *See* Doc. 48 ¶ 40.  Much like the *Michaels* statement, which implied that the plaintiff had engaged in conduct unbecoming of an officer without factual support, this statement implies that the Student Affairs Division, while led by plaintiff, wasted its money and suffered from financial incompetence.  On the current record, the court cannot say that the finances statement is incapable of providing the requisite predicate for a defamation action.

### ii.      Of and Concerning Plaintiff

To have potential to defame, a statement must be one about the lawsuit's plaintiff, or, at least, reasonably be understood to refer to plaintiff.  *See* Restatement (Second) of Torts § 564 (1977); *see also Hale v. Emporia State Univ.*, No. 15-4947-SAC-KGS, 2016 WL 3277264, at *9 (D. Kan. June 15, 2016) ("To be defamatory, a statement must be of and concerning the plaintiff.").

Mr. Bardo contends that he intended for the finances statement to communicate to Mr. Conklin information about the state of the Student Affairs Division.  Perhaps, and perhaps a factfinder would find that the statement merely referenced the condition of the Student Affairs Division generally.  But at this stage, and in the context of this motion, the court is unable to conclude that no reasonable factfinder could find the statement refers to plaintiff.  After all,

plaintiff alleges that Mr. Bardo made these statements in response to Mr. Conklin's question asking why WSU terminated plaintiff.[13]

          **c.**      **The Bureaucratic Statement** ("The Student Affairs Division is too bureaucratic in nature.")

Mr. Bardo argues that the Complaint fails to allege the bureaucratic statement supports Count III for two reasons.  First, Mr. Bardo argues that the bureaucratic statement is an opinion. Then, Mr. Bardo argues that the Complaint fails to allege that the bureaucratic statement concerns plaintiff.  As for Mr. Bardo's second argument, the court cannot conclude that no reasonable factfinder could find the bureaucratic statement refers to plaintiff for the same reason the Complaint alleges as the finances statement.  *See supra*, Part IV.C.1.b.ii.  The Complaint alleges that Mr. Bardo made both statements in response to Mr. Conklin's question about WSU's reasons for terminating plaintiff's employment.

This leaves Mr. Bardo's other argument—that the bureaucratic statement is a personal opinion or hyperbole incapable of providing the predicate for a defamation action under Kansas law.  *See Byers*, 237 P.3d at 1271 (discussing *Gatlin*, 26 P.3d 1284).  In *Gatlin*, the Kansas Court of Appeals ruled that the statement, "[the husband] isn't . . . totally innocent in all this, there are things about him you don't know," constituted a statement of personal opinion and thus could not defame the plaintiff.  26 P.3d at 1287.  In *Byers*, the Kansas Court of Appeals held that statements which described plaintiff as staggering and smelling strongly of alcohol were "recounting of objective observations, not opinion and hyperbole," and thus could be defamatory.  *Snyder*, 237 P.3d at 1271.

---

[13]      Mr. Bardo cites *New York Times Co. v. Sullivan*, to support his assertion that plaintiff's defamation claim fails because the statement fails to identify plaintiff specifically.  The Supreme Court in *Sullivan*, however, held that a statement that only mentioned the plaintiff once and referred to general police conduct, which the plaintiff oversaw, was insufficient, at trial, to connect the statement to the plaintiff.  376 U.S. at 291–92.  Here, a reasonable factfinder could find that the circumstances surrounding Mr. Bardo's statements to Mr. Conklin about the Student Affairs Division connect Mr. Bardo's statement to plaintiff.

The statement that WSU's Student Affairs operation was too bureaucratic amounts to opinion and hyperbole.  It could not have defamed plaintiff.  It is more like the unactionable statement in *Gatlin* that plaintiff was "[not] totally innocent."  *See Gatlin*, 26 P.3d at 1284, 1287.  The ordinary meaning of the words in the statement—that the operation was "too" bureaucratic—reports a subjective opinion that no plaintiff can prove as factually true or false.  One cannot verify, factually, whether WSU's Student Affairs operation under plaintiff's leadership was "too bureaucratic" in the way one could verify whether a person had staggered and smelled of alcohol.  *Cf. Snyder*, 237 P.3d at 1271.  Because the statement consists of opinion and hyperbole—and not fact—the court concludes that it cannot provide the predicate to support a defamation claim.  It thus grants judgment against plaintiff's defamation claim to the extent it relies on this statement.

> **d.** **The Punitive Statement** ("The conduct process overseen by [plaintiff] was too punitive in nature rather than educational as it should be.")

Mr. Bardo argues that the punitive statement cannot support a defamation claim because it is an opinion.  This statement is similar to the bureaucratic statement addressed above.  It is a subjective opinion that one cannot verify factually.  It cannot support a defamation claim and so, the court enters judgment against Count III to the extent it relies on this statement.

> **e.** **The Hierarchical Statement** ("The current operation is too hierarchical and punishment-centered.")

Mr. Bardo argues that the hierarchical statement cannot support a defamation claim because it is an opinion.  This statement is similar to the bureaucratic statement.  It is a subjective opinion that one cannot verify factually.  This statement cannot be false and thus it cannot support a defamation claim.

### f.    Summary

The court enters judgment against Count III's reliance on the bureaucratic, punitive, and hierarchical statements because these statements cannot be false; instead, they are opinion statements. *See Gatlin*, 26 P.3d at 1287 (holding that statements that convey a personal opinion are not defamatory).

The court denies the motion, however, as it applies to the finances statement because it fails to disclose unidentified facts, which brings it into the realm of defamation. *See Michaels*, 71 F. Supp. 3d at 1260. The court denies the motion against this claim's reliance on the finances statement because the court is unable to conclude that no reasonable factfinder could conclude that the finances statement refers to plaintiff. *See* Restatement (Second) of Torts § 564 (1977) (noting that a statement that one can *reasonably* understand as being about the plaintiff is sufficient to support a defamation claim).

The court likewise declines to enter judgment against plaintiff's reliance on the credentials statement even though it fails to allege when and to whom Mr. Bardo made it. Instead, the court grants plaintiff leave to amend his Complaint to include the necessary information. But if this amended Complaint fails to correct the deficiencies within 21 days of this order being issued, defendants may file another motion for judgment on the pleadings for this claim.

### 2.    Privacy Claim (Count IV)

Count IV of plaintiff's Complaint asserts a claim for invasion of privacy. Doc. 48 at 15. The Complaint alleges that Mr. Bardo invaded plaintiff's privacy when he made statements to Mr. Conklin and published the job announcement in the Registry. This claim, in essence,

repackages the finances, bureaucratic, punitive, and hierarchical statements that plaintiff also claims constitute defamation.

The parties agree in their briefs that Count IV asserts a claim for two types of privacy claims:  "false light" invasion of privacy; and giving publicity to plaintiff's private life.  *See* Doc. 56 at 27; Doc. 58 at 30.  Mr. Bardo contends these claims fail for several reasons.  The court will addresses both theories and each of Mr. Bardo's arguments below.

### a.      False Light Privacy

"The elements of a claim for false light invasion of privacy are as follows:  (1) that publication of some kind must be made to a third party; (2) that the publication must falsely represent the person; and (3) that representation must be highly offensive to a reasonable person."  *Dominguez v. Davidson*, 974 P.2d 112, 121 (Kan. 1999).  Courts generally analyze defamation and false light invasion of privacy claims in the same manner.  *Stead v. Unified Sch. Dist. No. 259, Sedgwick Cty., Kan.*, 92 F. Supp. 3d 1088, 1109 (D. Kan. 2015) (quoting *Booth v. Elec. Data Sys. Corp.*, 799 F. Supp. 1086, 1091 (D. Kan. 1992)).  The two claims differ in that a plaintiff, to allege a claim for false light privacy, must allege that defendant published the false statement to the public at large.  *Id.* (quoting *Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032, 1043 (D. Kan. 1998)).  In contrast, a statement can be defamatory when a defendant communicates it to just one person.  *Id.* at 1106 (citing *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1071 (D. Kan. 2006)).

Mr. Bardo argues that the Complaint fails to allege the first two elements—publication to a third party and falsely representing the plaintiff—adequately.  Doc. 56 at 27.  As the court already discussed, the finances statement—"the Student Affairs Division improperly allocated finances in supporting the institution's goals"— is the only statement alleged in the Complaint

that could portray plaintiff falsely.  *Supra*, Part IV.C.1.  The other statements are opinions that cannot be false.  *See Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir. 1983) (applying Kansas law and explaining that "the defense available in a defamation action that the allegedly defamatory statements are opinions, not assertions of fact, is also available in a false light privacy action").  The finances statement thus can support a false light invasion of privacy claim if Mr. Bardo made the statement to the public at large.

Mr. Bardo argues that the Complaint alleges, at most, that Mr. Bardo made his statements to the student body president and no one else.  Doc. 56 at 28.  To publish a false light statement, the speaker must communicate the statement "'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become public knowledge.'"  *Dominguez*, 974 P.2d at 121 (quoting *Ali*, 929 F. Supp. at 1388).  The Complaint here alleges no such publication; it alleges only that Mr. Bardo made the Finances Statement to Mr. Conklin.  The Complaint alleges that later, *The Wichita Eagle* published Mr. Bardo's statement after the newspaper asked Mr. Conklin why WSU had fired plaintiff.  But the Complaint never alleges that Mr. Bardo did anything to cause this newspaper to publish this statement or otherwise acted to publish the statement to the public at large.

The Complaint's allegations entitle Mr. Bardo to judgment as a matter of law against the false light privacy claim.  The court thus grants judgment against this claim.

### b.    Publicity Given to Private Life

Mr. Bardo next argues that the court should enter judgment against plaintiff's publicity given to private life claim.  Publicity given to a person's private life recognizes liability for "[o]ne who gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable man."  *Froelich v. Adair*, 516 P.2d 993, 996 (Kan. 1973).  Plaintiff

must allege the following elements to sustain a private life claim under Kansas law: (1) the defendant gave publicity to a matter concerning plaintiff's private life; (2) the matter was such that it would be highly offensive to a reasonable person; and (3) it was not of legitimate concern to the public. *Werner v. Kliewer*, 710 P.2d 1250, 1256 (Kan. 1985).

Mr. Bardo asserts plaintiff's publicity invasion of privacy claim fails for several reasons. First, he reiterates his argument that he did not publicize any statement to the public at large. Second, Mr. Bardo argues that he is entitled to judgment because plaintiff has failed to identify the private facts that Mr. Bardo specifically publicized. Third, Mr. Bardo argues that the Complaint fails to allege that Mr. Bardo publicized any private facts. Fourth, Mr. Bardo argues that the Complaint alleges that Mr. Bardo's statements were false, which takes the statements outside the realm of a private life claim. Last, Mr. Bardo argues that plaintiff cannot bring a claim for private life publicity because he is a public official and his job duties are a matter of public concern.

As discussed below, the Complaint alleges that Mr. Bardo publicized only the hierarchical statement—"[t]he current operation is too hierarchical and punishment-centered." But plaintiff is a public figure and so, the hierarchical statement touched on a matter of legitimate public concern. Thus, plaintiff cannot prevail on a private life privacy claim as a matter of law. The court explains its reasoning, below.

### i.    Publicity

Similar to false light privacy claims, a plaintiff must allege that the defendant made the statement public. *Werner*, 710 P.2d at 1256. "'[I]t is not an invasion of the right of privacy . . . to communicate [a private fact] to a single person or even to a small group of persons.'" *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a). When a defendant causes a newspaper

or some other widespread publication to publish a statement, the defendant has publicized the statement.  *Hunter v. The Buckle, Inc.*, 488 F. Supp. 2d 1157, 1179 (D. Kan. 2007) (quoting Restatement (Second) of Torts § 652D cmt. a (Am. Law Inst. 1977)).

Here, the Complaint alleges that Mr. Bardo publicized the finances, bureaucratic, and punitive statements solely to Mr. Conklin.  As explained above, Mr. Bardo never publicized his statements to the public because he did nothing to cause Mr. Conklin to repeat these statements to *The Wichita Eagle*.  *See supra*, Part IV.C.2.a.  But the Complaint alleges that Mr. Bardo publicized the statement that the "current operation is too hierarchical and punishment-centered" in the Registry.  The Complaint also alleges that Mr. Bardo used the Registry—a widespread publication—to post an announcement for plaintiff's job that included the hierarchical statement in the announcement.  The Complaint thus alleges that Mr. Bardo caused the Registry to publish the hierarchical statement and the Complaint thus alleges that Mr. Bardo publicized it.

### ii.    Public Official

But this does not end the analysis.  The Supreme Court of Kansas has held that public officials do not have a right to privacy for the manner "in which [they] conduct[] [themselves] in office."  *Rawlins v. Hutchinson Pub. Co.*, 543 P.2d 988, 993 (Kan. 1975); *see also Rinsley v. Brandt*, 446 F. Supp. 850, 857 (D. Kan. 1977), *aff'd on other grounds*, 700 F.2d 1304 (10th Cir. 1983) ("While plaintiff has not waived his right to keep private details of his life secret, he cannot shelter from public scrutiny his administration of a public position in a field of critical public interest.").  Mr. Bardo asserts that because plaintiff worked as Vice President of Student Affairs at a publically funded university, he was a public official and thus had no right to expect privacy about how he conducted himself in office.

To determine whether plaintiff was a public official when Mr. Bardo made his statements the court considers all relevant circumstances. *Rinsley*, 446 F. Supp. at 856. In *Rinsley*, our court determined that the plaintiff was a public official when he worked as "Director of the Children's Section at Topeka State Hospital and Associate Clinical Professor of Psychiatry at the University of Kansas School of Medicine." *Id.* In particular, *Rinsley* noted that plaintiff worked exclusively at public institutions and conducted research partially funded by the State of Kansas. *Id. Rinsley* determined that, in light of the case law, the plaintiff was a public official. *Id.* at 856–57 (citing *Adey v. United Action for Animals, Inc.*, 361 F. Supp. 457, 461–62 (S.D.N.Y. 1973) ("[A] research scientist employed by NASA and involved in preparation for a space flight by a monkey was held to be a public official.").

Like the plaintiff in *Rinsley*, plaintiff here served in a leadership position at a state funded institution. Plaintiff was Vice President of WSU, a large, publically funded university in Kansas. The court thus concludes that plaintiff was a public official at all times relevant to his claims. But as the next section explains here, the court's analysis cannot stop.

### iii.    Legitimate Concern to the Public

Though public officials do not have a right to privacy about the way they conduct themselves in office, *Rawlins*, 543 P.2d at 993, public officials still maintain privacy rights in their private life, *see id.* Because the court determines plaintiff was a public official, the court now must determine whether the hierarchical statement was a subject of legitimate concern to the public. *Werner*, 710 P.2d at 1256.

Plaintiff alleges that the information about his impending termination affects his privacy interest in his reputation, character, and activities. Restatement (Second) of Torts § 652(D) gives the following examples of facts that are considered suitably private: "Sexual relations . . . family

43

quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a [person's] life in [the person's] home, and some of [the person's] past history that [the person] would rather forget." *Id.*; *cf. Rawlins*, 543 P.2d at 993 (affirming summary judgment against a police officer's private life claim based on a newspaper article about the officer's misconduct ten years earlier because the officer's misconduct involved "the manner in which he conducts himself in office").

Here, the hierarchical statement—which discussed why WSU had terminated plaintiff's employment—is not the kind of private information entitled to the level of privacy protected by Kansas law. It does not involve sexual relations, family quarrels, illnesses, personal letters, or details about home life. While the hierarchical statement may publicize aspects of plaintiff's reputation, character, and activities, its content discusses nothing that is suitably private; instead, it discusses the way plaintiff had conducted himself in office. As a matter of law, plaintiff's impending termination was a subject of legitimate concern to the public, and plaintiff had no privacy rights in Mr. Bardo's statements.

Plaintiff's publicity given to private life and false light invasion of privacy claims both fail as a matter of law. Mr. Bardo thus is entitled to judgment on the pleadings against Count IV.

### 3.   KORA (Count VII)

Plaintiff's last claim asserts that WSU has violated the Kansas Open Records Act ("KORA"). Defendant argues that the court must enter judgment against Count VII because Kansas state courts have exclusive subject matter jurisdiction. KORA provides: "The district court of any county in which public records are located shall have jurisdiction to enforce [KORA] . . . ." Kan. Stat. Ann. § 45-222(a). The Kansas state district courts thus have exclusive jurisdiction over KORA claims. *See Tholen Supply Co., Inc. v. Cont'l Cas. Co.*, No. 93-2224-

JWL, 1994 WL 482635, at *2 (D. Kan. Aug. 4, 1994) ("[Kan. Stat. Ann.] § 45-222 vests the

state district courts of the counties where the public records in question are located with the

exclusive subject matter jurisdiction over claims arising under the Kansas Open Records Act.").

Because the court lacks subject matter jurisdiction over plaintiff's KORA claim, the court

dismisses it; but it does not enter judgment against the claim.  *See Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 94 (1998) ("'Without jurisdiction the court cannot proceed at all in

any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function

remaining to the court is that of announcing the fact and dismissing the cause.'" (quoting *Ex*

*parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868))).  The court dismisses Count VII without

prejudice.

## V.    Conclusion

For the reasons explained above, the court grants defendants' Motion for Judgment on the

Pleadings in part and denies it in part.  The court grants defendants' motion against plaintiff's

claim against Mr. Bardo for invasion of privacy (Count IV).  The court also grants defendants'

motion against plaintiff's defamation claim (Count III) to the extent it relies on the bureaucratic,

punitive, and hierarchical statements.  The court denies defendants' motion against Count III to

the extent it relies on the credentials statement without prejudice and grants plaintiff leave to

amend his Complaint to include allegations of when and to whom Mr. Bardo made the credential

statement.  If plaintiff fails to do so within 21 days of this order being entered, defendant may

file a renewed motion for judgment on the pleadings.  Last, the court grants defendants' motion

against plaintiff's § 1983 (Count II) to the extent it relies on the bureaucratic and punitive

statements.  Also, it dismisses plaintiff's claim against WSU for violating KORA (Count VII).

Otherwise, the court denies the motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the defendants' Motion for

Judgment on the Pleadings (Doc. 55) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 13th day of February, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
